UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CONTINENTAL INSURANCE
COMPANY, ET AL.                                     CIVIL ACTION

V.                                                  NO. 14-2967*

L&L MARINE TRANSPORTATION,
INC., ET AL                                         SECTION "F"

*Applies to: 15-1870, 15-1942

ORDER AND REASONS

Before the Court is River Ventures' motion for summary judgment. For the following reasons, the motion is DENIED.

**Background**

The incident giving rise to this pending lawsuit began on December 29, 2013 on the Mississippi River. On that evening, the M/V ANGELA RAE, owned by C.J.L., Inc. and operated by L&L Marine Transportation, Inc., was traveling southbound with the FSP 101 barge. The M/V FREEDOM (owned and operated by River Ventures) and the M/V MISS DOROTHY were traveling in the same direction; both vessels attached a line to the FSP 101 barge. The FREEDOM was on the port side of the barge and the MISS DOROTHY was on the starboard side, with the ANGELA RAE face-up and in control, at least to some extent, of the barge.

During the voyage, Captain Colomb, captain of the MISS DOROTHY, informed the ANGELA RAE that the MISS DOROTHY needed to change fuel filters. However, that change did not happen

1

immediately. Instead, approximately 30 minutes prior to reaching the Sunshine Bridge, Captain Colomb ordered his deckhands, Joshua Deranger and Matt Lynch, to change the fuel filters. In order to complete the task, the deckhands shut down the MISS DOROTHY's starboard engine. This shutdown allegedly caused a drag on the flotilla. The captain on the ANGELA RAE attempted to inform the MISS DOROTHY of the drag it was causing, and he allegedly received a response that the MISS DOROTHY would give "more straight rudder." When the flotilla attempted to pass under the Sunshine Bridge, however, the MISS DOROTHY allided with bridge; the vessel was deemed a total loss.

Following the incident, multiple lawsuits were filed and consolidated into this civil proceeding pending before this Court. One of the actions that resulted is River Ventures, L.L.C.'s limitation of liability action. River Ventures was the owner and operator of the FREEDOM; several parties have filed claims against River Ventures as part of the limitation proceeding. River Ventures now moves the Court to grant summary judgment in its favor, dismissing all claims against it as it pertains to the limitation proceeding.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to

2

judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claim. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). Finally, in evaluating the summary

judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

II.

"When damages involve a tow or an entire flotilla, courts employ the 'dominant mind' doctrine to 'place liability on the tug and absolve the tow from liability.'" N.M. Paterson & Sons, Ltd. v. M/V Ethel E., No. 01-7325, 2004 WL 170326, at *3 (N.D. Ill. Jan. 14, 2004) (quoting In re TT Boat Corp., No. 98-494, 1999 WL 123810, at *3 (E.D. La. Mar. 3, 1999)). "The 'dominant mind' doctrine provides that the vessel that is liable is the vessel whose people are actually in control of the operation." Id. (citing Chevron U.S.A. Inc. v. Progress Marine Inc., No. 77-463, 1980 A.M.C. 1637 (E.D. La. Aug. 24, 1979), aff'd, 632 F.2d 893 (5th Cir. 1980)). A tug is considered the "dominant mind" when it provides the motive power. See id. "A tug that tows the tow into collision is presumed to be at fault, especially if that collision is with a stationary object." N.M. Patterson, 2004 WL 170326, at *3 (citing Ryan Walsh Stevedoring Co. v. James Marine Serv., Inc., 557 F. Supp. 457, 461 (E.D. La. 1983)). "If the tug is the 'dominant mind,' the tug is responsible for knowledge of navigational conditions, including knowledge of channels, depth of water, obstructions, pipelines and other dangers to her tow." Id.

"When a helper tug merely furnishes power in obedience to orders from the primary tug *without any negligence on its part*, it

should be exonerated from all liability for damages to the tow." Complaint of Patton-Tully Transp. Co., No. 79-2315, 1982 WL 195694, 1983 A.M.C. 1288, 1299 (E.D. La. Sept. 24, 1982) (emphasis added); see also Moran Towing & Transp. Co. v. Empresa Hondurena De V., 194 F.2d 629 (5th Cir. 1952). However, a tug is not always immune from liability when it is not the "dominant mind." Patton-Tully, 193 A.M.C. at 1299-1300. "A helper tug will be deemed at fault when it fails to comply with the lead tug's orders." Id. at 1300 (citing Panama Canal Co. v. Sociedad de Transportes Maritimos, 272 F.2d 726 (5th Cir. 1959). Another court has expounded on Patton-Tully stating:

> As Patton-Tully makes clear, however, as assist vessel must be free of negligence to be absolved from liability. If the non-dominant party 'breached a duty or acted in a negligent manner that contributed to the damages … [it] may be held partially or solely liable.'

Matter of the Complaint of Ingram Barge Co., No 13-3453, 2016 WL 1450027, at * 9 (N.D. Ill. Apr. 13, 2016) (alterations in original) (internal citations omitted).

The case history makes clear that an assist tug does not escape liability under the "dominant mind" doctrine when the assist tug is found negligent in some manner. Therefore, the question before this Court is whether the FREEDOM was negligent in any manner, such that she does not escape liability under the "dominant mind" theory.

III.

5

## A.

River Ventures contends that the ANGELA RAE was the lead tug, or dominant mind of the flotilla, which means that the FREEDOM was merely was an assist tug. Because the ANGELA RAE was allegedly the lead tug, River Ventures submits that the ANGELA RAE is solely liable for any damage to her tow. Specifically, River Ventures submits that the ANGELA RAE and the MISS DOROTHY are liable for the MISS DOROTHY's allision and damages. It contends that the ANGELA RAE never gave any order to the FREEDOM to change its trajectory or otherwise alter its operations before the allision with the Sunshine Bridge, submitting:

> Q: Were there any instructions from the ANGELA RAE to you [captain of FREEDOM] above the bridge to either shut down one of your engines or pull back on the RPMs?
>
> A: No, sir.
>
> Q: Was there any navigational instructions of any nature to you from the ANGELA RAE before the impact?
>
> A: No, sir.
>
> Q: Same question with regard to the DOROTHY to you. Navigational instructions of any nature from the DOROTHY to you before impact?
>
> A: No, sir.

Deposition of Dickey Bergeron, captain of the FREEDOM. Because the ANGELA RAE was the dominant mind, and the dominant should bear the burden to keep the flotilla safe, River Ventures urges that the FREEDOM is not at fault for the allision because it received no

orders, and thus did not fail to follow any orders, from the dominant mind. Accordingly, River Ventures submits that summary judgment is appropriate because there is no genuine issue of material fact as to the FREEDOM not contributing to the cause of the allision.

*B.*

In response to River Ventures' motion, Joshua Deranger, Joseph Colomb, Western Rivers Boat Management, Quality Marine Services C.J.L. and L&L Marine Transportation oppose River Ventures' contention that it could not have contributed to, and cannot be liable for, the allision and resulting damages. The opposition relies specifically on certain deposition testimony of Dickey Bergeron, captain of the FREEDOM. Capt. Bergeron testified that as the flotilla was approaching the Sunshine Bridge, he noticed that the flotilla was not properly aligned to safely navigate under the bridge. In response, Capt. Bergeron was questioned about his communication with the other two vessels, stating:

> A: Well, we were going down in the center span as usual, and something happened. We just fell toward the starboard, and as we were coming down, we just kept on going to the starboard.
> The ANGELA RAE said something about – told the DOROTHY they were putting too much of a drag on them or whatever, and he couldn't get out of it before he hit the fender works on the bridge.
>
> Q: Who is "he," when you say "he"?

A:   The ANGELA RAE.

Q:   Do you remember any radio communication other than the ANGELA RAE reporting that "you're creating too much drag on me," from the point in time you first had the recognition a quarter of a mile away until contact with the bridge fender was made? Any other communication you can recall from the vessels that were part of this flotilla?

A:   I didn't talk to the ANGELA RAE about it. I didn't want to clog up the radio because he was in control of everything. I didn't know if he wanted me to pull him out of it or whatever. He never did tell me to back him out or anything.

Q:   So there was no communication between you and the ANGELA RAE, correct?

A:   No.

Q:   Was there any communication you heard between the DOROTHY and the ANGELA RAE other than "you're putting a drag on me," or whatever it was he said?

A:   I don't know if the DOROTHY responded to him after he said that on the radio.

Q:   Just to be sure we are clear, between the point in time you first recognized your location, about a quarter of a mile from the Sunshine Bridge, until contact was made with the fender system, the only communication you can recall is the ANGELA RAE, something to the effect of you are putting a drag on me?

A:   Yes.

Q:   And you don't remember any other communication between those two boats?

A:   I don't remember any. There was probably some other communication, but I don't remember.

…

Q:   During that same point in time, did you have any communication with the DOROTHY?

A:   No, sir.

…

Q: Was there any action you took to avoid the DOROTHY making contact with the Sunshine Bridge fender system?

A: No.

Capt. Bergeron then continued to testify that, despite noticing that the flotilla was off of the proper sail line when approaching the Sunshine Bridge, he did not notify the ANGELA RAE or the MISS DOROTHY of his concerns. He even testified that when he noticed the flotilla's "off position," there was still time for the flotilla to correct its alignment and likely avoid the ultimate contact with the Sunshine Bridge. Instead, Capt. Bergeron testified that he did nothing because he received no orders from the ANGELA RAE, the vessel he perceived as the lead of the flotilla. Contrary to Capt. Bergeron's position that he did nothing because he was not instructed to do anything, he also testified that, "If the barge started drifting to one side or the other, I would just back off of my engines, whether they told me to or not." Counsel responded with, "The barge did start drifting, didn't it?" To which Captain Bergeron responded, "Yes, sir."

Additionally, the opponents submit two expert reports, both of which conclude that the FREEDOM was negligent and contributed to the allision. First, David H. Scruton concluded that:

> whether lead tug or not[,] since FREEDOM and MISS DOROTHY had lines secured to FSP 101 they were obliged to maneuver the tow as necessary and keep the other vessels apprised of developments. … We note comments that

9

> FREEDOM and MISS DOROTHY were there for the ride; however, once lines were secured to barge FSP 101 by both FREEDOM and DOROTHY they were clearly involved in the tow and maintained responsibilities for successful operation. As such, both FREEDOM and MISS DOROTHY were obliged to assist in the tow … .

Next, in Captain James Jamison's expert report, he found that:

> It cannot be disputed, all parties involved in this case agree that lack of communication between all three vessels was a large factor in the collision. The M/V MISS DOROTHY and the M/V FREEDOM were not hitching a ride, they were on the payroll and contributed to the navigation of the tow. **Captain Dickey Bergeron of the M/V FREEDOM neglected his duties by continuing at the same speed despite the M/V MISS DOROTHY being at half power, contributing to pushing it into the bridge. He knew or should have known that the M/V MISS DOROTHY was under powered and the flotilla was getting dangerously close to the bridge.**

(emphasis added). The parties submit, therefore, that the admissions of Capt. Bergeron, in conjunction with expert reports, create a genuine issue of material fact as to whether the FREEDOM is free of negligence or contributed to the allision giving rise to this storied lawsuit. The Court agrees.

*B.*

A genuine issue of material fact is in dispute as to whether the FREEDOM was negligent as an assist tug.

River Ventures contends that because the FREEDOM was an assist, or helper, tug, it is protected from liability under the dominant mind doctrine. River Ventures relies on the position that the FREEDOM apparently never received any order from the ANGELA

RAE, or the MISS DOROTHY, that it needed to change is power or otherwise make any navigational changes as the tow approached the Sunshine Bridge or while the MISS DOROTHY changed filters. These arguments, River Ventures submits, necessarily means that it is not liable to any party for allision with the bridge and resulting damages. The Court disagrees. River Ventures patently disregards a prerequisite for the "dominant mind" doctrine's shield – that the assist tug be free of negligence.

Other parties to this dispute, and claimants in this limitation of liability action, have submitted compelling evidence that raises a genuine question of whether the FREEDOM acted negligently. As explained in depth above, any negligence attributed to an assist tug absolves its shield from liability. Specifically, the parties largely rely on deposition testimony of the FREEDOM's captain, Dickey Bergeron, where he testified that not only did he notice the flotilla was off line for a safe approach of the Sunshine Bridge, but he also testified that when he noticed the issue there was sufficient time to correct that navigational error. However, he did not communicate his concerns to the MISS DOROTHY or to the ANGELA RAE; instead, he relied on the other vessels' lack of communication as justification for not vocalizing his concerns and for not making any navigational changes. Further, the expert reports submitted both conclude that even if the FREEDOM was not the lead tug, it had a duty to act prudently. Specifically,

the experts conclude that the FREEDOM knew or should have known of the navigational issue and should have communicated concerns to the other vessels. Therefore, the Court finds that there is a genuine issue of material fact – was the FREEDOM negligent in not noticing or communicating the navigational issue that at least in part led to the allision. This issue is undoubtedly in dispute because lack of negligence is a prerequisite for the dominant mind shield from liability to apply to an assist vessel. Because a necessary element of this defense is in question, summary judgment as to the FREEDOM's liability is not appropriate on this record.

Accordingly, IT IS ORDERED that limitation in liability petitioner River Ventures' motion for summary judgment is hereby DENIED.

New Orleans, Louisiana, August 9, 2017

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE