```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA

CONTINENTAL INSURANCE
COMPANY, ET AL.                                      CIVIL ACTION

V.                                                   NO. 14-2967

L&L MARINE TRANSPORTATION                            SECTION "F"
INC., ET AL.
```

ORDER AND REASONS

Before the Court is Joshua Deranger's motion for partial summary judgment. For the following reasons, the motion is DENIED.

**Background**

Three vessels were tasked to transport one barge on the Mississippi River. Unfortunately, one of those vessels allided with a bridge and sunk, rendering it a total loss. Now, the vessels' owners, insurers, and those personally injured during the allision are seeking to determine whether the other two vessels were negligent and unseaworthy, and thus liable for the resulting losses and injuries.

On December 29, 2013, three vessels, M/V MISS DOROTHY, M/V ANGELA RAE, and M/V FREEDOM were transporting a barge, FSP 101, southbound on the Mississippi River. FSB 101 is owned by Consolidated Grain & Barge, Inc. CGB hired the vessels to transport the barge and its cargo from Reserve, LA to Convent, LA. The vessels successfully navigated the barge to Convent and had offloaded the cargo. They were to return FSP 101, without cargo,

to LaPlace. M/V ANGELA RAE was positioned at the stern, M/V FREEDOM on the port bow, attached by line, and M/V MISS DOROTHY on the starboard bow, also attached by line. Whether ANGELA RAE's position at the stern of the barge, pushing the barge forward, makes it the lead vessel is contested by the parties. The lead vessel has specific responsibilities to communicate with and direct the assist vessels.

While heading southbound to LaPlace, the master of MISS DOROTHY, Captain Joseph Colomb, advised ANGELA RAE that he would need to change MISS DOROTHY'S fuel filters at some point. Colomb allegedly directed a deckhand to change the fuel engines two days before, but he failed to do so. MISS DOROTHY's wheelhouse engine information gauges were allegedly broken, as was its general alarm, which allows the captain to alert anyone in the engine room of danger. After the tow proceeded downriver several miles, MISS DOROTHY reported to the master of Angela, Captain Kenneth Ayers, that MISS DOROTHY was experiencing engine troubles. Ayers also overheard Captain Colomb instructing his deckhand, Joshua Deranger and Matt Lynch, to change the fuel filters of the starboard and port engines. Deranger and Lynch were not experienced at changing fuel filters on this vessel. At this point, the flotilla was about one mile from the Sunshine Bridge, and moving about ten miles an hour. When Deranger and Lynch changed the filters of the starboard engine, they shut it down. This caused a drag on the flotilla. The

master of Angela, Captain Ayers, attempted to inform MISS DOROTHY of the drag it was causing, in which MISS DOROTHY responded that it would give a "more straight rudder." Allegedly ANGELA RAE and FREEDOM did not otherwise adjust their speed. It is disputed how much the vessels communicated here, although FREEDOM'S master, Captain Bergeron, was silent after MISS DOROTHY attempted to change its engine filters.

When the flotilla attempted to pass under the Sunshine Bride, MISS DOROTHY allided with the bridge. The vessel sustained a puncture in the hull, which caused water to rapidly enter the engine room, ceasing operation of the port engine and the generator, eventually resulting in a total loss for the vessel. The bridge was also damaged. Joshua Deranger, the deckhand on the MISS DOROTHY, was still in the engine room during the allision. When the water flooded the room, it moved a storage box, trapping Deranger's leg between the box and the starboard engine. Matt Lynch helped to free him, but Deranger was seriously injured. Captain Colomb also alleges personal injuries.[1] Following the allision, the vessel owners and insurers, as well as those injured, filed a number of claims against each other in five separate actions (14-

---

[1] This Background section is not to be interpreted as findings of contested allegations and contentions. The Court is simply attempting to provide a broad factual background of the December 29, 2013 voyage.

2967, 15-1473, 15-1870, 15-1942, 15-4423), which have been consolidated into one lead case, 14-2967.

The insurers of the owner (Western Rivers Boat Management, Inc.) of the sunken MISS DOROTHY initiated the present case on December 29, 2014. The insurers—Continental Insurance Company, National Union Fire Insurance Company, and Starr Liability and Indemnity—filed a complaint in this Court against L&L Marine Transportation, Inc. (operator of Angela), C.J.L., Inc. (owner of Angela), River Ventures, LLC (owner and operator FREEDOM), M/V ANGELA RAE *in rem*, M/V FREEDOM *in rem*, and FSB 101 *in rem*. They alleged that the defendants caused the allision, were unseaworthy, and were negligent in their training of the master and crew, in their failure to equip the vessels with proper navigational tools, and in their navigation. In a separate action, C.J.L. and L&L filed a complaint for exoneration from, or in the alternative limitation of liability, of M/V ANGELA RAE. Five days later, River Ventures did the same for M/V FREEDOM. Immediately, the Court issued an injunction restraining the prosecution of any claims involving ANGELA RAE or FREEDOM, or their insurers and underwriters, until the Court determines whether the vessels' liability should be limited or exonerated. Shortly thereafter, the Court consolidated these claims into the master case (14-2967).

In response to C.J.L. and L&L's complaint to limit or exonerate liability, the owner of FREEDOM, the owner, operator,

and insurers of MISS DOROTHY, and Captain Colomb of MISS DOROTHY[2] all filed answers and complaints. Likewise, in response to River Ventures complaint to limit or exonerate liability, the owner and operator of ANGELA RAE, the owner, operator, and insurers of MISS DOROTHY, and Captain Colomb of MISS DOROTHY all filed answers and complaints. Joshua Deranger, the MISS DOROTHY deckhand injured during the collision, answered the C.J.L. and River Ventures complaints, filed counterclaims against them, and third-party complaints against Western Rivers Boat Management, Quality Marine Services, Continental Insurance, National Union Fire, Starr Liabilities, Atlantic Specialty Insurance (insurer of C.J.L. and L&L), and Underwriters at Lloyds (insurer of C.J.L. and L&L). Deranger alleged that all parties were liable for his injuries, which was the result of all three vessels' negligence in either causing, or failing to prevent, the allision.

On July 6, 2017, River Ventures filed a motion for summary judgment moving the Court to dismiss all claims against it. In its August 9, 2017 Order and Reasons, the Court denied the motion, holding that there was a genuine issue of material fact as to whether FREEDOM was negligent in its conduct immediately preceding the allision. Joshua Deranger now moves the Court to grant partial

---

[2] Captain Colomb had also filed a separate complaint against Western Rivers, River Ventures, and C.J.L. for negligence and unseaworthiness in its operations during the voyage, causing severe physical injuries.

summary judgment in its favor and to determine that, as a matter of law, C.J.L. & L.L is not entitled to exoneration or limitation of liability.

I.  Legal Standard: Motion of Summary Judgment

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent

6

opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)(internal quotation marks and citation omitted). Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. Id. at 249 (citations omitted); King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

II. Legal Standard: Limitation of Liability Act

The Limitation of Liability Act permits a vessel owner to limit its liability with respect to claims arising from the vessel's operation. See 46 U.S.C. § 30501, *et seq.* But the owner is only entitled to limit its liability if it lacks "privity or knowledge" of the cause of the loss or injury. Brunet v. United Gas Pipeline Co., 15 F.3d 500, 504 (5th Cir. 1994). When a court determines whether a shipowner is entitled to exoneration or limitation of liability, it employs a two-step process. Farrell Lines, Inc. v. Jones, 530 F.2d 7, 10 (5th Cir. 1976). First, the party seeking to dissolve limitation must establish that the vessel was negligent or unseaworthy, and those acts caused the accident. Petition of Kristie Leigh Enterprises, Inc., 72 F.3d 479, 481 (5th Cir. 1996). Then, "the burden shifts to the owner of the vessel to prove that negligence was not within the owner's privity or knowledge." In re Hellenic, 252 F.3d 391, 395 (5th Cir. 2001).

To establish unseaworthiness, the claimant must establish that the vessel was not "reasonabl[y] fi[t] to perform or do the work at hand." Farrel Lines, 530 F.2d at 10, n.2. Further, a vessel is unseaworthy if it is not adequately prepared to successfully navigate foreseeable hazards or challenges it may face. Walker v. Harris, 335 F.2d 185, 191 (5th Cir. 1964). An incompetent or inexperienced crew can, but does not necessarily, create an

8

unseaworthy condition. <u>Orient Mid-East Lines, Inc. v. Shipment of rive on Board S.S. Orient Transporter</u>, 496 F.2d 1032, 1040 (5th Cir. 1974). However, the party cannot just prove that the vessel was unseaworthy; it must also establish that the unseaworthy condition was the proximate cause of the injury or damages. <u>Smith v. Trans-World Drilling Co.</u>, 772 F.2d 157, 162 (5th Cir. 1985). Specifically, the party moving to dissolve limitation must show "that (1) the unseaworthiness played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." <u>Id.</u>

A court will deny limitation of liability if the shipowner had knowledge or privity of the negligent acts or unseaworthy conditions that caused the damage or injury. <u>Farrell Lines</u>, 530 F.2d at 10. The owner has privity "if he personally participated in the negligent conduct or brought about the unseaworthy condition." <u>In re Omega Protein, Inc.</u>, 548 F.3d 361, 371 (5th Cir. 2008) (quoting <u>Trico Marine Assets, Inc. v. Diamond B Marine Services, Inc.</u>, 332 F.3d 779, 789 (5th Cir. 2003)). "When the shipowner is a corporation, knowledge is judged by what the corporation's managing agents knew or should have known with respect to conditions or actions likely to cause the loss." <u>Brunet</u>, 15 F.3d at 504. Accordingly, "knowledge of an unseaworthy or negligent condition is normally imputed to a corporate owner if

9

the 'condition could have been discovered through the exercise of reasonable diligence.'" Omega Protein, 548 F.3d at 371 (quoting Brister v. A.W.I., Inc., 946 F.2d 350, 356 (5th Cir. 1991). However, a master's mistake of navigation, when he is otherwise competent and the owner exercised reasonable care in selecting him, does not bar limitation of liability. Id.; Kristie Leigh Enterprises, 72 F.3d at 481.

## III. Discussion

Joshua Deranger moves the Court for partial summary judgment on the basis that M/V ANGELA RAE was unseaworthy at the inception of the December 29, 2013 voyage, and the unseaworthy conditions were the proximate cause of his injuries. Deranger also contends that C.J.L. and L&L had knowledge and privity of the unseaworthy conditions. Because Deranger's second contention relies on a finding of his first, the Court will begin with considering whether ANGELA RAE was unseaworthy and the proximate cause of Deranger's injuries.

Deranger provides five reasons why ANGELA RAE was unseaworthy at the inception of the voyage: (1) It did not have a policy in place outlining the responsibilities of being the lead tug. (2) The crew was not trained of the responsibilities of lead tug. (3) There was no meeting with all three vessel captains to discuss and assign their responsibilities. (4) The vessel did not adequately

10

communicate with the assist vessels (FREEDOM and MISS DOROTHY) after MISS DOROTHY began experiencing engine problems. (5) The vessel employed an incompetent crew. A critical premise to Deranger's argument is that ANGELA RAE was the lead tug because it was the face-up vessel situated at the stern, and as lead tug, had specific responsibilities to communicate with and direct the other vessels. Deranger cites to the deposition of L&L's owner, Lee LeBoeuf, which reveals that LeBoeuf was not aware that ANGELA RAE was the lead vessel, and believed that all the vessels shared communication responsibilities. Deranger contends that had L&L maintained a lead vessel policy and provided training, than the captains of M/V ANGELA RAE would have known to take control, properly communicated with assist vessels, instruct M/V MISS DOROTHY on when and where to accomplish the fuel filter change, and would have ordered a unified effort to steer the flotilla back on its proper sail line, thus avoiding the allision.

In support of its contentions, Deranger submits an expert report authored by Captain James Jamison. Jamison opines that Captain Ayers failure to communicate to MISS DOROTHY and FREEDOM, correct the sail line, or otherwise direct MISS DOROTHY and FREEDOM prior to the allision rendered him incompetent; his errors were not just navigational in nature. Jamison states that C.J.L. and L&L's failure to have a policy addressing the responsibilities as lead tug was highly unusual and contrary to industry custom.

According to Jamison, had C.J.L. and L&L had a multi-tug policy, trained their crew and captains in the responsibilities of lead vessel, and conducted a pre-voyage meeting, the allision probably would not have occurred.

C.J.L. and L&L submit expert evidence to rebut Deranger's claims. Captain David Scruton states in a sworn declaration that ANGELA RAE's Captain Ayers was competent. He points to Ayer's credentials for support; Ayer's served as Designated Examiner for the U.S. Coast Guard since 2008, where he was tasked with assessing candidates for towing vessel licenses. He was also employed by L&L for four years at the time of the incident, and had never been involved in a prior casualty. Accordingly, the competency of Captain Ayers is a genuine dispute of fact that is not appropriate for summary judgment decision.

Moreover, in his expert report, Captain Scruton attacks the notion that conduct on the ANGELA RAE were the proximate cause of Deranger's injuries. First, he states that vessels secured at the stern of the barge, pushing it forward, are often, but not always, the lead vessel. Regardless of whether ANGELA RAE was the lead tug, MISS DOROTHY and FREEDOM still had the obligation to maneuver the tow and to keep the other vessels apprised of developments, like if there were any structures ahead or they were experiencing technical difficulties on board. Scruton states that although it would have been "desirable" for FREEDOM and ANGELA RAE to have

12

communicated better once they were aware that MISS DOROTHY created a drag, Colomb should have instigated communications with ANGELA RAE because he was in the best position to assess what problems MISS DOROTHY was facing. It is Scruton's opinion that Colomb's lack of communication was the "primary causal factor that led to the incident."

Scruton also faults Colomb for his decision to send Deranger into the engine room at that time, calling Colomb's actions unprofessional and unsafe. He points to the fact that Colomb knew that both engines were not functioning properly, Deranger was not familiar with changing MISS DOROTHY's fuel filters, and the flotilla was quickly approaching the Sunshine Bridge in a quick current. Further, the general alarm was allegedly broken, preventing Colomb from notifying Mr. Deranger of any pending danger while he was in the engine room.

The parties' submitted evidence demonstrates that there are genuine disputes of material fact as to what was the proximate cause of Deranger's injuries. No one contests Deranger's claims that C.J.L. and L&L failed to provide a lead vessel policy, host a meeting to determine each vessels responsibilities, or specifically train the crew in its responsibilities as a lead vessel. But Deranger fails to show that those shortcomings were a substantial part in bringing about the injury and that the injury was the reasonable probable consequence of their conduct. It is

not clear that had there been a policy in place and had the parties agreed on their roles ahead of time, either MISS DOROTHY would have not shut down its starboard engine while approaching a structure, or that the other vessels would have acted differently and would have been able to successfully correct the drag and avoid allision. Further, C.J.L. and L&L submit evidence implicating Colomb's actions as the proximate cause of Deranger's injuries. Because the parties have submitted evidence displaying a genuine dispute of fact as to which party proximately caused Deranger's injury, summary judgment is not proper.

Accordingly, IT IS ORDERED: Joshua Deranger's motion for partial summary judgment is DENIED.

New Orleans, Louisiana, October 26, 2017

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE